## 32257. PINKSTON *v.* THE STATE.

GARDNER, J. Joe Pinkston was convicted of assault with intent to murder Ray Reese, the prosecutor, and was given six to ten years in the penitentiary. The case is here on review, for that the evidence is insufficient as a matter of law to sustain the verdict of guilty. The defendant is a negro. The prosecutor is a white man. The evidence shows beyond dispute that the prosecutor was the father of two boys, one 20 years old and one 16 years old. The older son had a difficulty with the defendant. The prosecutor and his son were well acquainted with the defendant. The evidence further shows, without successful contradiction, that the older son was wayward. On the day of the alleged assault with intent to murder, while the prosecutor was working, the two sons came in contact with the defendant somewhere near the defendant's home. The older son and the defendant had some sort of difficulty. The evidence for both the State and the defendant is in sharp conflict concerning the cause of the difficulty. As a result of this difficulty, no harm resulted to either the defendant or the sons of the prosecutor. After the difficulty, the younger son returned to his father's home and reported that the older brother had engaged in some sort of difficulty with the defendant, and that the older son had obtained a rifle and a pistol and had returned to the scene of the difficulty between the boys and the defendant. Thereupon the prosecutor got in his truck and sought to locate his boys. The prosecutor testified in part substantially: He did not know the defendant as Joe Pinkston, but as Dude Pinkston; that he did not see the defendant on the day Joe Pinkston shot the prosecutor with a shotgun. The prosecutor was in front of the defendant's house. The occasion of the prosecutor's going to where his older boy had had some trouble was that the prosecutor was in the field and the younger boy came to him and informed the prosecutor that J. L. Ray, the older boy, had obtained the gun and pistol and had gone down where "the Pinkstons boys" were. The prosecutor told his younger son to get the truck out of the back yard, and they would try to get him off (that is, the older boy), so that neither would get killed. The prosecutor wanted to

keep down trouble, so he got in his truck as quickly as he could. When he arrived, he found his older boy stopped at a house not far from where the defendant lived. The house was about 75 yards from the defendant's house. The prosecutor demanded of his older son the gun and pistol and the son gave them to him. The prosecutor remarked to his older son, "What are you doing down here? You ought to be at home. You have no business being in trouble like this." The prosecutor then took the guns and put them in his truck and drove down to the defendant's house. Before the difficulty between the prosecutor and the defendant, the prosecutor came in contact with a brother of the defendant and inquired of the brother what the trouble was. Being informed by his younger son that the brother of the defendant did not have the difficulty, the prosecutor further testified: " 'Who was it?' Dude Pinkston in the house—at least I didn't know where he was, but he was in the house, he said, 'Tell that ball-headed s.o.b. I am the one that did the shooting.' When he said that I went out of the truck, it made me mad, and when I hit the ground and came from behind the door he poured it into me. He hit me in the stomach and in the arm and in the face. I would think I would have had a weapon in my hand at that time, I would have been a fool, I think, not to have had it. I would not say I did or didn't. I would not want to swear definitely I had it or would not want to swear definitely I did not have it, but ordinarily I think I reached and got it as I came out of the truck. He shot me from the house, he never was on the outside no time I was there. He shot me through the window. When I got shot, as well as I recollect the shot sort of paralyzed me and I think I sort of slumped over like this and I was sick at the stomach, and I ran my hand in there and saw my belly was bleeding. I looked at my arm and couldn't move it, it was shot all to pieces. I said, 'That fool has shot me all to pieces.' About that time George Pinkston, his brother, ran up to me. He said, 'Mr. Wray, get in the truck, he is fixing to shoot you again, get in the truck quick before he do,' and when I made an effort to go to the truck he makes a break for the house—George did. He said, 'I am going to get you, you s.o.b., you shot Mr. Wray.' He said, 'Don't come in here, George, I kill you, God damn you,' said it as I was getting in the truck trying to drive off. I drove the truck away then. I have the shirt that I had on at the time. This is it (after producing same). Those are shot holes across the front. I had the cigarette case in this pocket, just like that (producing same).

"Cross-examination by Mr. Thigpen. My son told me there was some shooting down there. As a matter of fact there was no shooting until I got there as far as I know. I did not shoot into Pinkston's house. I imagine this shooting took place at the house where Dude Pinkston lives. I live in Warren County. This happened two miles over the line, in Glascock. It did not happen at the place where I live. I took the gun and pistol away from my son at the house this side of Pinkston's house. I told my son he had no business down there into nothing, to go home. I would not think I said, 'Every time I find you, you are at a damn negro's house.' I would not say I did or did not say that. I put the gun and pistols in the truck and drove immediately on down to

Dude Pinkston's house. That was 75 yards from the house, by guess work. When I drove from the first house down to Pinkston's house, my two youngest boys, Neal Reese and Cecil Reese, were with me. I drove up in the yard and C. L. Pinkston made a break for the house just as hard as he could run, and I called him and he came to me. He came right up to the truck where I was. I would not doubt if I didn't have a pistol on my hand when he came up to my truck. I thought he was the man that had had trouble with my son, J. L. He did not finally convince me he was not the man—my boy in the truck with me told me he was not the man. I was not doing anything at the time that was said, but about the time that was said was when Dude Pinkston said, 'Tell that bald-headed son of a bitch that I am the man did the shooting.' I knew that was Pinkston from his voice. He worked for me two years. I know his voice anywhere I hear it. I did not see him. Then I went out of the truck and I tell you I went right square out, like that. There was no telling where I had started, I don't know. I was looking for Dude Pinkston, I will tell you that. He was in the house—that is where he shot me from; if he was ever on the ground I haven't seen him. I would not say I had started in the house, I don't know where I was going. I am satisfied I was mad enough to do anything. I would not say I was mad enough to go in the house, but I don't think I would go in the house on a mad bull if I knew it. I don't know who was behind the gun that shot me. I went to the doctor. I stopped at the house where I got the guns. My son, J. L. was there. Immediately when I got to the house I said, 'That s.o.b. has shot me.' J. L. took the gun and was going back to kill him. I couldn't do nothing with him, so I give out I was weak and Neal says, 'J. L. [older son] don't go, carry Daddy to the doctor.' "

The uncontradicted evidence for the defendant shows that the older boy of the prosecutor was the sole cause of the difficulty prior to the shooting, although the older son and the younger son of the prosecutor testified that the previous trouble arose because of uncivil treatment, by the defendant, of the younger son. Be this as it may, after the previous difficulty, the defendant went to and into his home and was there when the prosecutor unwisely, if not unlawfully, was seeking revenge and according to the prosecutor's own testimony it is easily ininferable that the prosecutor was seeking to invade the habitation of the defendant with a pistol at the time the defendant in defense of himself and his family shot the prosecutor through a glass window. We deem it unnecessary to go further into the evidence of remonstrance and persuasion which the defendant used toward the prosecutor not to invade the defendant's habitation. It will be observed that the prosecutor himself said, and the evidence quoted from him showed, that he was mad and that he would have been a fool not to have carried his pistol with him. Just for what? Evidently, in search of revenge. And evidently to the extent, from the view of any reasonable man in the position of the defendant, to do violence to the defendant. There is considerable other evidence which we have not mentioned, even in substance, that the older son was unjustified in anything he did concerning the previous difficulty. This evidence comes both from the State and from the de-

fendant's statement. We can not let such a verdict stand as a matter of law. See the recent case decided by this court, *Brocken* v. *State*, 76 *Ga. App.* 585 (46 S. E. 2d, 738). That case is similar in principle to the instant one. It differs only in degree of the offense charged. The court erred in overruling the motion for a new trial.

*Judgment reversed. MacIntyre, P. J., and Townsend, J., concur.*

DECIDED DECEMBER 2, 1948.

*J. D. Godfrey, Casey Thigpen,* for plaintiff in error.
*J. Cecil Davis, Solicitor-General,* contra.